# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| THOMAS J. STEINES, ) | |
| ) | No. 16 C 6370 |
| Plaintiff, ) | |
| ) | Magistrate Judge M. David Weisman |
| v. ) | |
| ) | |
| DONALD W. MENRISKY and ) | |
| SUSAN MENRISKY, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is defendants' motion to modify the temporary standby order. The Court held an evidentiary hearing on December 19, 2016. The motion seeks particularized relief including bonus payments to employees of SimpleSoft, Inc., as well as rent payments. Additionally, the motion seeks relief related to corporate tax issues still lingering from 2015. For the reasons stated herein, the motion is granted in part and denied in part.

## Background

**Brief summary of litigation and claims**

The parties are in agreement that Judge Feinerman, at a hearing on December 14, 2016, found a deadlock under 805 Ill. Comp. Stat. 5/12.56(a). (ECF #90 at 3.) This finding allows a court to order various relief. The scope of that relief is contested by the parties, and addressed below. When acting under 5/12.56, a court's objective is to "preserve the corporate assets and carry on the business of the corporation until a full hearing can be had." 805 Ill. Comp. Stat. 5/12.60(d).

**Court's Authority to Act**

Plaintiff Steines filed a motion contesting this Court's jurisdiction to act on the defendants' motion for relief, raising two issues. First, Steines argues that a magistrate judge lacks the authority to definitively act on injunctive relief, citing to 28 U.S.C. § 636. Second, Steines argues that this Court lacks authority under 5/12.56 to "create corporate action" and is limited to enforcing or modifying action that has already been enacted by the corporation. (ECF #90 at 6.)

As to the limits under 5/12.56, Steines' position is simply wrong as a matter of statutory construction. In various ways, the statute makes clear that a court has the authority to order affirmative acts. As an initial matter, 5/12.56(b) provides *inter alia* that a court "may order . . . *the performance,* prohibition, alteration, or setting aside of any action of the corporation." (emphasis added.) The inclusion of "performance" in this context disproves the limited reading that Steines propounds. The statute also describes a court's power as "including but not limited to" a wide variety of actions, including the *performance* of corporate act. *Id.* Finally, 5/12.56(c) provides that the enumerated powers noted in subsection (b) (*supra*) "shall not be exclusive of other legal and equitable remedies which the court may impose." In short, Steines' argument is wholly without statutory language support. We therefore reject it, and find that this Court has the authority to order corporate acts based on the deadlock found by Judge Feinerman.

As to Steines' injunctive authority argument, while not wholly convinced that it is correct, we find the argument more meritorious. We are not convinced that modifying an agreed order (which was not decided by the district court on the merits but merely adopted by the court) is necessarily injunctive relief. Additionally, the parties contest whether the controlling agreed order [ECF #23 & #43] is still applicable. (*See* ECF #77 n. 1 (defendants assert that the agreed

order is no longer controlling because there no longer is a preliminary injunction hearing scheduled). Interpreting the meaning of an injunction is not considered awarding injunctive relief. *Compare American River Transportation Co. v. Ryan*, 579 F.3d 820, 824 (7th Cir. 2009) (distinguishing between an order interpreting an injunction and one modifying an injunction as defining appellate jurisdiction). Finally, this Court is being asked to direct Simplesoft to take certain action. Simplesoft is not a party to this matter, and under Federal Rule of Civil Procedure 65(d), injunctive relief is limited to the parties of an action and those acting in concert with them. *United States v. Kirschenbaum*, 156 F.3d 784, 794 (7th Cir. 1998) ("A district court may not enjoin non-parties who are neither acting in concert with the enjoined party nor are in the capacity of agents, employees, officers, etc. of the enjoined party."). For all of these reasons, we have our doubts as to whether this Court is being asked to award injunctive relief of any kind.

In any event, because this Court's order (irrespective of which authority under which we act) will be reviewable, *see* Federal Rule of Civil Procedure 72, we have confined our affirmative relief to the powers vested in this court under 5/12.56, a statutory grant of authority we are completely comfortable exists.

**Relief Sought**

Defendants seek various forms of relief, which we identify below in ascending order of difficulty.

*Bonus to Susan Menrisky*

In their motion, the Menriskys originally sought a $3,000.00 bonus for Susan Menrisky. (ECF #77 at 9.) At the hearing itself, counsel for the Menriskys withdrew the bonus request. The request is therefore denied as moot.

*Bonuses to Other Simplesoft Employees*

The Menriskys seek permission to pay bonuses to three key employees identified in their motion. In his filing, Steines conceded that the Agreed Standby Order did "not prohibit" the payment of these bonuses. (ECF #76 n.1.) Steines appears to equivocate as to his position on the employees' bonuses, noting that these employees had not received bonuses in the past. (ECF #91 ¶¶ 17, 18.)

Guided by 5/12.60(d)'s mandate that a court is to "preserve the corporate assets and carry on the business of the corporation" when acting under powers vested by 5/12.56, we find that payment of these three bonuses totaling $11,000.00 will achieve both purposes. Since this litigation has been initiated two key employees have left the company. (*See* ECF #88 ¶¶ 37-41.) These employees, historically, had received substantial bonuses. (*Id.*) With their collective departure, other employees have had to take on added responsibilities. (*Id.* ¶¶ 39-40.) Additionally, the company currently has cash-on-hand in excess of $240,000.00. (*Id.* ¶ 59.) So, the payment of $11,000.00 will not create adverse financial consequences for the company. Because this Court cannot predict the future, we must allow for the possibility that Simplesoft will be sold as an ongoing entity as well as the possibility that the company will be liquidated. Securing the continued employment of key employees bolsters the value of the company as an ongoing entity. These bonuses will help achieve that purpose without significantly depleting the

company's assets.[1]  For these reasons, Simplesoft can pay the requested bonuses for the three key employees identified in defendants' motion.

*Past Due Salary Payments to the Menriskys*

The Menriskys seek payments of past due salaries of $4,166.67 for Donald Menrisky, and $2,083.33 for Susan Menrisky. Significantly, in both the original stand-by order (ECF #23 ¶¶ B, D) and the agreed order to extend the temporary injunctive relief (ECF #43 ¶ B), defendants agreed to waive any claim to the salary they now seek. In the agreed order to extend temporary injunctive relief, defendants specifically agreed to forego seeking any "catch up" payments. *Id.* The only explanation they offer as to why they should now receive these payments is that the payments represent their normal salary payments.

The defendants have not presented any business reason to justify these payments. Again, this Court is seeking to "preserve the corporate assets and carry on the business of the corporation." More than four months ago in the agreed order to extend temporary injunctive relief, the Menriskys affirmatively waived their right to seek these catch-up payments. They have continued diligently to operate the company without these payments. The Court acknowledges that equity may dictate that the Menriskys should receive this compensation. From the perspective of preserving assets or carrying on the business entity, however, there is no persuasive reason to undo an agreement that the Menriskys entered into voluntarily and has not adversely impacted Simplesoft (any more than the litigation itself).

---

[1] Steines posits a concern that these bonuses are a guise to "buy loyalty" to Mr. Menrisky. (ECF #91 ¶ 17.) However, Menrisky is only seeking the ability to provide bonuses to three of the six full-time employees of the company. And, Menrisky is not seeking to provide bonuses to part-time employees, some of whom appear to have added more value to the company, and thus would be more valuable to a "Menrisky spin-off." If Menrisky were seeking to provide a bonus to all employees, including the "key employees" who have recently left the company and only provide part-time services at this time, Steines' concern would be more plausible. Under the circumstances presented here, the Court does not believe that Menrisky is attempting to "buy personal loyalty" with corporate assets.

*Rent Payments*

The Menriskys seek rent payment on the lease for the Simplesoft headquarters in Springboro, Ohio. The Menriskys make a compelling argument that rent payments must be initiated, but the issue is complicated by the fact that Menriskys Investment, LLC, which is owned by the Menriskys, is the property's owner. (ECF #88, ¶ 8; *id.*, Exs. M & N.) Thus, payments on the lease are in effect payments to the Menriskys. The evidence presented by the Menriskys shows that monthly costs are as follows:

| | |
|---|---|
| Mortgage payment: | $3,926.00 |
| Landscape/snow removal: | $184.00 |
| Maintenance | $113.00 |
| Property taxes: | $934.00 |
| Insurance (flood and property) | $256.00 |
| Total: | $5,413.00 |

(*See* ECF #88, Ex. EE (calculations drawn from annual figures).)

At the hearing, Donald Menrisky testified that Menrisky Investment is responsible for maintenance and repair of the property. Menrisky further testified that there are no significant immediate expenses or costs that need to be addressed. Through counsel, defendants indicated that they had exhausted their cash reserves to service the mortgage, necessitating their request for authority to make rent payments using Simplesoft funds going forward.

Pursuant to a lease agreement, in 2016 Simplesoft had been paying Menrisky Investment $5523.00 per month in rent. (ECF #88, Ex. M & Ex. BB.) In 2015, prior to the partial and informal business dissolution between Steines and the defendants, Steines, on behalf of Simplesoft, had been paying rent of $5,361.79 per month to Menrisky Investment. (*Id.*) Additionally, the defendants present a series of emails involving Steines making clear that Steines was aware of, and agreed to, the increasing rent demands of Menrisky Investment. (*Id.*, Exs. R-BB.) Defendants also offer the monthly rent paid by Springboro Counseling, $1,735.74,

the other tenant of the Simplesoft headquarters building, as evidence of the reasonableness of the rent payments from Simplesoft to Menrisky Investment. (*Id.*, Ex. DD.) Finally, defendants note that Steines had a similar relationship with Simplesoft, which leased space in a building owned by Steines for its Chicago office. Defendants suggest that their arrangement is no different.

For his part, Steines argues that the lease agreement for his own property was much less expensive for Simplesoft. Steines also suggests that the Simplesoft office space in Springboro is larger and more elaborate than necessary. Finally, Steines argues that the lease agreement between Simplesoft and Menrisky Investment was not properly authorized by the Simplesoft board, a contention that Menrisky admits.

Again, the Court's goal is to preserve the value and business operations of Simplesoft. If the rent payment issue involved a neutral third-party landlord, the issue would be much easier to resolve: The rent would be paid per the controlling lease agreement. But the situation presented allows for the Menriskys to be enriched via payments to Menrisky Investment.

The cost and attendant disruption of moving Simplesoft's headquarters from the current location counsel against allowing the property to go into foreclosure leading to eventual eviction. While the eviction process is time consuming (so one might argue to let the property go into foreclosure and attempt to resolve the dissolution issue in the meantime), there is no short-term solution to Simplesoft's current deadlock. Thus, this Court believes it is prudent to maintain the company's headquarters at its current location without the risk of looming foreclosure. Therefore, payments to Menrisky Investment are necessary.

However, the Court is not inclined to direct that the current lease value be paid to Menrisky Investment. Based on the evidence presented, the lease is likely not enforceable as it was based on Donald Menrisky's unilateral acts, and not approved by the Simplesoft board.

7

Therefore, there is little risk that Menrisky Investment can sue Simplesoft for failing to pay the rent set forth in the agreement. Additionally, the lease payments are in excess of what is necessary to cover the costs incurred by Menrisky Investments to service the mortgage and related costs.

Finally, the lease value appears at a premium compared to the building's other tenant's rent costs, which work out to $17.03 a square foot. (ECF #88 ¶ 27.) Simplesoft pays $20.86 a square foot. (*Id.* ¶ 17.) While defendants explain that the Simplesoft space has certain amenities that the neighboring tenant's space lacks, Simplesoft has significantly more space than the co-tenant, which would suggest that Simplesoft's square footage rate should be less than the smaller tenant's square-footage rate. At the hearing, counsel for defendants stated that there was no relationship between the defendants and Springboro counseling. Thus, we are comfortable that the co-tenant's lease payments are a fair representation of the market value of the building. Using Springboro Counseling's rent per square foot as a fair market value assessment, Simplesoft's monthly rental payments would be $4,508.69. We believe that this monthly rental payment amount ($4,508.69) to Menrisky Investment going forward will ensure that Simplesoft maintains its corporate headquarters, will allow its landlord (Menrisky Investment) to keep current on its financial obligations,[2] and will establish a cushion to cover ongoing maintenance costs.

Between the proposed payments by Simplesoft ($4,508.69) and the payments from the building's other tenant ($1,736.00), the monthly revenue stream will be $6,244.69. This will be a sufficient amount to cover the associated expenses. It also represents a fair return to the

---

[2] Add footnote totaling insurance, mortgage, and tax payments as compared to revenue streams

Menriskys on their investment property, using a market rate that does not unfairly enrich the Menriskys to the detriment of plaintiff.

Defendants also seek back rent from Simplesoft. This request is denied. Simplesoft has not paid rent since August 2, 2016 (ECF #88 ¶ 20), and Menrisky Investment has been able to service the mortgage to present based on its reserves. While it is undisputed that Menrisky Investment cannot continue going forward under these conditions, there was no evidence to suggest that Menrisky Investment needs the back rent to remain solvent. Thus, there is no compelling reason (at this time) for the Court to order Simplesoft to make the back rent payments as doing so would not serve to "preserve the corporate assets and carry on the business of the corporation."

*Menrisky Bonus*

The largest payment defendants seek is a $175,000.00 bonus for Donald Menrisky. (ECF #77 at 10.) Menrisky has demonstrated a history of bonus payments ranging from $6,000.00 to $180,000.00. (ECF #88, Ex. MM.) Menrisky also testified that he factored in a bonus payment as part of his overall financial compensation and for financial planning purposes. Menrisky has also demonstrated that he is the source for a significant amount of Simplesoft's revenues. If Menrisky were solely an employee of Simplesoft, the Court's view as to awarding Menrisky a bonus would be clear. He would receive a bonus.

However, Menrisky is not solely an employee. He is a 50% owner of Simplesoft. Thus, he has a significant economic interest (separate and apart from any bonus) in maintaining the value of Simplesoft and continuing its business operations. Indeed, whether Simplesoft is liquidated or sold-off as a result of this litigation, Menrisky stands to directly benefit from the dissolution, and therefore, has every economic interest necessary to continue his efforts to further

the financial success of Simplesoft. Unlike the employees noted above, there is no business justification to pay Menrisky a bonus as an incentive or reward for his performance.

At the hearing, Mr. Menrisky testified that if he did not receive a bonus, he would consider leaving Simplesoft, and made a strong case that he is a primary source of revenue for Simplesoft. Yet, Mr. Menrisky also made clear that he could make more money at other companies, and that some of the fringe benefits he receives from Simplesoft (*e.g.*, car leasing, employment with his wife, car insurance payments), he could obtain while negotiating for a new position. In short, while Mr. Menrisky demonstrated that he is a valuable contributor to the company's success, he also seemed to demonstrate a willingness to consider other options if the right opportunity came along. Significantly to the Court, Menrisky's testimony seemed to suggest that he could cut all ties with Simplesoft and its customers, and do just as well or better elsewhere. Stated from Simplesoft's standpoint, if Menrisky left the company, his revenue producing services would be lost, but he would not deplete the company of its client base or its existing employees. Indeed, Mr. Menrisky made clear that customers are free to associate themselves with various companies that provide the services offered by Simplesoft. These arguments seem to cut both ways. Menrisky made a lot of money for Simplesoft (which weighs in favor of retaining him to achieve the benefits of an ongoing business), but he is asking for a significant bonus to stay (which would deplete corporate assets). Because Menrisky has no current offer pending requiring that Simplesoft entice Menrisky to stay, the Court does not believe that a compelling business case has been made to pay Menrisky a bonus.

Menrisky, however, does offer another reason to pay him a bonus, and that is the tax consequences of not doing so. Simplesoft's tax strategy over the years has been to attempt to "reduce the amount of cash on hand by the end of each tax year so as to appropriately mange the

tax burden." (ECF #89, ¶ 4.) Simplesoft has reduced the amount of cash on hand at year's end in part by paying bonuses "based on the profitability of its divisions." *Id.* If the company fails to do so, its "shareholders will, instead, be forced to personally shoulder a significant tax liability." (*Id.* ¶ 6.) This is a standard tax strategy for S corporations like Simplesoft. (*Id.* ¶ 4.)

Unfortunately, defendants' proposed approach of paying Menrisky a bonus would effectively deplete corporate assets while solely benefiting Menrisky. The alternative, not paying any bonus to Menrisky, will preserve the corporate assets, and create a tax liability for both shareholders. Because this Court is mandated to preserve corporate assets, and not enrich individual shareholders, it will not allow any bonus to be paid to Menrisky. Both shareholders will suffer the tax consequences equally, as both will be 50% responsible for Simplesoft's cash-basis driven revenue (approximately $240,000.00 based on current cash balances), and will have to determine on an *individual* level how they will fund the tax liability.

The Court recognizes that this disposition does not serve to benefit the individual interests of either shareholder, but of course, the Court's dictate does not include advantaging one shareholder over another. *See People ex rel., Fahner v. Community Hospital of Evanston*, 108 Ill.App.3d 1051, 1059 (1st Dist. 1982) (appointment of receiver is appropriate is justified where directors are disposing of corporate assets "in their own interest" such that assets will be lost prior to any judgment). This unfortunate circumstance is a creation of the shareholders' own making. If the parties wish to propose an agreed resolution to this issue, they are of course free to do so, and seek the necessary relief from the Court.

*2015 Tax Return*

Finally, the Court has been asked to resolve a continuing business issue as to the filing of the 2015 tax returns. All parties agree that the 2015 return is overdue, and beyond any available

11

extension date. Thus, while the issues need to be resolved promptly, there is not an immediate deadline looming. All parties agree that there is a *potential* significant tax consequence if certain payments received by Donald Menrisky in 2015 are treated as a distribution rather than a loan. However, the precise adverse consequence is not fully agreed upon. Additionally, there are factual issues surrounding this issue that need to be resolved.

Therefore, the Court orders briefing as follows on the tax issue:

1/20/17: Defendants to file a memorandum of law and factual support as to its proposed resolution of the 2015 tax issue

2/3/17: Plaintiff to file a response.

2/10/17: Defendants to file a reply.

2/24/17: Motion hearing at 9:30 a.m.

**SO ORDERED.** **ENTERED: 12/19/16**

_____
**M. David Weisman**
**United States Magistrate Judge**