UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS J. STEINES, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | 16 C 6370 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| SUSAN MENRISKY, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DONALD W. MENRISKY, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff/Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SHERYL STEINES, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Thomas Steines brought this suit against his former business partner, Donald Menrisky, and Menrisky's wife, Susan Menrisky, seeking damages and injunctive relief. Doc. 98. The Menriskys answered, Doc. 102, and Donald brought counterclaims against Thomas and third-party claims against his wife, Sheryl Steines, Doc. 95. The Steineses now move under Federal Rule of Civil Procedure 12(b)(6) to dismiss some of the counterclaims and third-party claims. Doc. 108. The motion is granted in part and denied in part.

### Background

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative pleading's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am.*

1

*Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the [pleading], documents that are critical to the [pleading] and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Donald's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013). The facts are set forth as favorably to Donald as those materials allow. *See Pierce v. Zoetis*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth those facts at this stage, the court does not vouch for their accuracy. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384 (7th Cir. 2010).

Donald and Thomas founded Simplesoft, a software company, about twenty years ago. Doc. 95 at ¶¶ 1, 3, 10. Donald and Thomas both contributed to the early development of the company, with Thomas running the Chicago division and Donald running the Dayton, Ohio division. *Id.* at ¶ 11. Although initially the Steineses owned all Simplesoft shares, in 1997 Sheryl gave up her shares, which were transferred to Donald, who became a 50% owner of the company. *Id.* at ¶ 14. In recent years, Susan took on an "operations manager" role, with responsibility for several management functions, such as benefits and health insurance. *Id.* at ¶ 20. Donald, Susan, Thomas, and Sheryl currently are directors and officers of Simplesoft. *Id.* at ¶¶ 1-4. The board is divided evenly between the Steines and Menrisky families. *Id.* at ¶ 15.

For several years, the Chicago division (run by Thomas) focused on information technology services for computer system infrastructure, while the Dayton division (run by Donald) focused on software development. *Id.* at ¶ 21. During that time, the Chicago division generated more revenue than the Dayton division. *Id.* at ¶ 22. Thomas and Donald nonetheless distributed profits evenly, which became a source of tension. *Id.* at ¶ 23. To resolve that tension,

Thomas and Donald entered into what has been called the "Grand Bargain." *Id*. at ¶ 24. Under the Grand Bargain, if one division was more profitable than the other, the difference would be paid as a bonus to whomever headed up the higher-earning division, after which (for tax reasons) the profits would be equally divided. *Id*. at ¶¶ 24-25.

In the early 2000s, Donald began to resell "customer relationship management software" and offer other customer-service focused products out of the Dayton division. *Id*. at ¶ 26. Over time, this caused the Dayton division to grow and become more profitable, while the Chicago division shrunk. *Id*. at ¶ 29. Thomas sold a particular product line and set of contracts to Collier Computing out of the Chicago division, initially splitting Collier's $100,000 up-front payment with Donald. *Id*. at ¶¶ 30-31. Thomas then announced his plan to retain the remainder of the Collier sale proceeds because, in his view, they were generated by the Chicago division. *Id*. at ¶ 31. Thomas would end up collecting over $100,000 of those proceeds. *Id*. at ¶ 32.

Although the Chicago division's business had shrunk, Thomas continued to do work for Simplesoft, largely in the form of accounting, taxes, and payroll management. *Id*. at ¶¶ 33, 35. He also performed, on Simplesoft's behalf, consulting services for Kraft Foods. *Id*. at ¶ 34. In 2011, Thomas declared himself finished with Simplesoft and began to shift to his own bank account the proceeds derived from the Kraft account. *Id*. at ¶ 36. Thomas and Donald then agreed that Donald would buy Thomas's Simplesoft stock. *Id*. at ¶ 37. The agreed buyout price was to be equal to the payments Donald had received from the Collier sale. *Id*. at ¶ 37. Thomas agreed to continue performing accounting and payroll functions, in exchange for Simplesoft continuing to pay for his health insurance. *Id*. at ¶ 39.

Simplesoft has been making payments to Thomas pursuant to the buyout agreement for the past several years. *Id*. at ¶ 43. Overall, those payments have totaled an amount "in the

neighborhood" of the agreed-upon buyout price. *Ibid*. Donald requested an accounting to confirm that his end of the bargain was complete, but Thomas did not comply. *Id*. at ¶ 44. Nor did Thomas offer Donald access to Simplesoft's financial records in QuickBooks. *Ibid*. Donald continued to press for access to the QuickBooks file, and Thomas continued to refuse. *Id*. at ¶ 46. As Donald became increasingly concerned, Thomas continued to refuse his demand and also committed numerous accounting practice errors, such as failing to make payroll on time. *Id*. at ¶ 47. When Donald confronted Thomas, Thomas accused Donald of "screwing him," with no further elaboration. *Id*. at ¶ 48. Thomas then said that he was going to start taking a salary for himself, and Donald strongly objected. *Id*. at ¶ 49.

In January 2016, Thomas finally turned over the QuickBooks file, which the Menriskys' accountant reviewed. *Id*. at ¶ 51. The accountant observed several abnormalities. *Id*. at ¶ 52. There were several instances that, according to Donald, amounted to theft by Thomas, including payments to himself or Sheryl for their own use, without notice to or approval of the Menriskys. *Id*. at ¶ 55. At that point, Donald notified Thomas that he intended to transfer all banking and accounting functions to Dayton, made arrangements for customers to send payments to an Ohio bank account, and engaged a third-party contractor to manage payroll. *Id*. at ¶¶ 58-60.

Thomas brought this suit in June 2016, on his own behalf and also purportedly on behalf of Simplesoft, against the Menriskys. Doc. 1. The Menriskys answered, and Donald filed a third-party complaint against Sheryl and counterclaims against Thomas. Doc. 26. Simplesoft then was dismissed as a plaintiff, without prejudice to Thomas filing derivative claims for Simplesoft's benefit. Doc. 36. The pleadings have been amended several times; the operative complaint is the second amended complaint, Doc. 159, and the operative counterclaims and third-party claims are the first amended counterclaims and third-party claims, Doc. 95.

4

**Discussion**

Donald has eleven counterclaims against Thomas, which allege individual and derivative claims sounding in fiduciary duty, conversion, conspiracy to commit conversion, breach of contract, theft of corporate opportunity, and unjust enrichment. Doc. 95 at ¶¶ 64-151. He seeks a variety of relief, including a forced sale of shares, dissolution, an accounting, and compensatory and punitive damages. *Id*. at ¶¶ 64-151. Donald's third-party claims against Sheryl, individual and derivative, sound in breach of fiduciary duty, conspiracy to commit conversion, unjust enrichment, and constructive trust. *Id*. at ¶¶ 152-91. The Steineses have moved to dismiss Counterclaims VI through XI and Third-Party Claims I, III, IV, and V in their entirety, and to partially dismiss Counterclaims IV and V and Third-Party Claim II. Doc. 108.

I.  **Counterclaims VIII and IX**

Counterclaims VIII and IX allege individual capacity claims against Thomas for breach of the Grand Bargain and the buyout agreement, respectively. The Steines seeks dismissal of those counts on two grounds, both of which fail to persuade.

A.  **Whether Counterclaims VIII and IX Plead Valid and Enforceable Contracts**

The Steineses first argue that Counterclaims VIII and IX fail to plead the existence of valid and enforceable contracts. Doc. 108 at 5-9. "Under Illinois law, a breach of contract claim has four elements: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) a breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Hess v. Bresney*, 784 F.3d 1154, 1158-59 (7th Cir. 2015) (internal quotation marks omitted); *see also Hammarquist v. United Cont'l Holdings, Inc.*, 809 F.3d 946, 949 (7th Cir. 2016) ("To prevail on a breach-of-contract claim in Illinois … the plaintiffs must show that there was a contract between the parties, and that [the defendants] breached the contract by failing to adhere to its

5

terms."). The existence of a contract requires, among other things, "definite and certain terms." *Cogswell v. CitiFinancial Mortg. Co.*, 624 F.3d 395, 398 (7th Cir. 2010).

The Steineses contend that because Donald fails to allege the time at which the parties entered into the Grand Bargain and the buyout agreement, the contracts lack "definite and certain terms." Doc. 108 at 5. This argument is wrong. "Under Illinois law, a contract is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain *what the parties have agreed to do.*" *Ass'n Ben. Serv.'s, Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 850 (7th Cir. 2007). The Grand Bargain provided that Thomas and Donald would permit the other to take a bonus at the end of any given year if one division generated more revenue that the other. The court's ability to understand this contract does not turn on the precise time of its inception.

The Steineses also contend that the Grand Bargain fails for lack of consideration. Doc. 108 at 6. Mutual promises constitute consideration under Illinois law. *See Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 507 (7th Cir. 2013). The Grand Bargain is supported by mutual promises; each 50% owner of Simplesoft agreed to forgo certain profits to which he otherwise would have been entitled, should certain conditions obtain, in exchange for the other's agreement to do the same when the shoe was on the other foot. That is sufficient to meet the consideration requirement. *See McInerney v. Charter Golf, Inc.*, 680 N.E.2d 1347, 1350 (Ill. 1997) (holding that consideration of mutual promises exists where an employer promises lifetime employment in exchange for an employee's promise not to accept another job offer).

The Steineses next and incorrectly contend that Donald failed to allege his own performance, breach, and damages as to the Grand Bargain. Doc. 108 at 6-7. Donald explicitly alleges his own performance, Doc. 95 at ¶ 117, and although he does not offer specific facts in

6

support, Rule 8 does not require him to do so. *See Swanson v. Citibank, N.A.*, 614 F.3d 400, 403-04 (7th Cir. 2010). As to breach and damages, the agreement called for a certain division of profits, and Counterclaim VIII alleges that Thomas "willfully and wrongfully t[ook] profit for his personal use that should have otherwise been distributed to [Donald]," and that the losses incurred were approximately $75,000. Doc. 95 at ¶¶ 118-19. That is enough to plead breach and damages.

The existence of the buyout contract, and the breach thereof, is also properly pleaded, largely for the same reasons. Donald alleges that he agreed to purchase Thomas's shares, that Thomas received payments for the shares, that Thomas did not relinquish the shares, and that this damaged Donald in an amount over $75,000. *Id.* at ¶¶ 43-44, 121, 124-125. That is sufficient to allege the contract's existence, performance by Donald, breach by Thomas, and damages.

### B. The Statute of Frauds

The Steineses contend that the Grand Bargain, an oral contract, is unenforceable under the Illinois Statute of Frauds. Doc. 108 at 3-5. The statute states in relevant part:

> No action shall be brought … upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized.

740 ILCS 80/1. "A contract is unenforceable [under the statute of frauds] only if it is impossible to perform the contract within one year. If, however, it appears from a reasonable interpretation of the terms of the agreement that it is capable of performance within one year, the Statute of Frauds is inapplicable." *Silvestros v. Silvestros*, 563 N.E.2d 1084, 1086 (Ill. App. 1990); *see also Taylor v. Canteen Corp.*, 69 F.3d 773, 784 n.5 (7th Cir. 1995) ("Under the Illinois Statute of Frauds, oral agreements that are not *capable of being fully performed* within one year are

7

unenforceable.") (emphasis added). The Steineses argue that because the Grand Bargain was "perpetual," it was not capable of performance within one year. Doc. 108 at 3-4.

As noted, the Grand Bargain required that a bonus be paid to either Thomas or Donald, depending on whether the Chicago or Dayton division was more profitable. Doc. 95 at ¶¶ 24-25. The agreement did not have a fixed term, but seeing as it depended on Thomas and Donald continuing to work for Simplesoft in their respective divisions, it is clear that the agreement would continue only so long as they stayed at Simplesoft and headed up their respective divisions. If immediately after the payment of a bonus, one partner chose to leave Simplesoft, performance of the Grand Bargain would be complete, as neither party would have any continuing obligations. Because it was possible for this to have occurred within one year of the Grand Bargain's formation, the Statute of Frauds does not bar its enforcement. *See Taylor*, 69 F.3d at 785 ("Where, as here, the promise of employment is cast in terms of lasting as long as the employee wants the job, the promise is capable of performance within one year and thus outside the Illinois Statute of Frauds.").

A case cited by the Steineses, *Gilliland v. Allstate Insurance Company*, 388 N.E.2d 68 (Ill. App. 1979), is inapposite. *Gilliland* concerned an oral contract that was to be performed over a specified period of time; it guaranteed the plaintiff's employment until he reached the age of sixty-two, which was more than one year after the agreement's formation. *Id*. at 69. The plaintiff contended that the Statute of Frauds was inapplicable because he could have quit, been fired, or died within the first year. *Id*. at 70. The court held that this did not render the Statute of Frauds inapplicable, because even if one of those eventualities occurred, the contract would not have been fully performed. *Ibid*. As the court explained, because the contract explicitly

8

*required* employing the plaintiff for more than one year, his death, resignation, or termination within the first year would result in the contract not having been fully performed. *Ibid*.

By contrast, at formation, the Grand Bargain's duration was to last only as long as Thomas and Donald remained with Simplesoft. In *Taylor v. Canteen Corporation*, *supra*, the Seventh Circuit held that a court faced with a Statute of Frauds challenge to an indefinite employment contract should:

> examine the precise terms of the promise to determine whether the occurrence of a stated contingency would complete performance of the contract, in which case the promise would be outside the Statute of Frauds, or whether such occurrence would frustrate the performance of the contract, in which case the promise would be within the statute's one-year provision.

69 F.3d at 785. Although the Grand Bargain is not an employment contract, and the contingency (one party leaving Simplesoft) is unstated, *Taylor* applies with full force here. The Grand Bargain's purpose was to harmonize earnings between the division leaders based on their respective performances, and in the event that Thomas or Donald left Simplesoft, there would be no need for further harmonization. If that happened, the parties would have no continuing obligation to one another, and because that could have happened within one year of the Grand Bargain's formation, the Statute of Frauds does not bar its enforcement.

## II.     Counterclaims VI and VII, and Third-Party Claim III

Counterclaim VI is a derivative claim for conversion, based upon payments Thomas is alleged to have directed toward himself and Sheryl in the course of handling Simplesoft's books. Doc. 95 at ¶¶ 97-105. The Steineses move to dismiss Counterclaim VI on the ground that the allegedly converted funds were not "specific and identifiable" and therefore cannot be the subject of a conversion claim. Doc. 108 at 9-10. They are wrong.

In *Kovac v. Barron*, 6 N.E.3d 819 (Ill. App. 2014), a 50% shareholder in a corporation brought a conversion action against the other 50% shareholder's wife, alleging that the second

shareholder had paid his wife excessive compensation and that the wife was a knowing participant in receiving the funds, which should have been distributed equally to both shareholders. *Id*. at 822, 838-39. The court held that those allegations did not state a conversion claim because the amounts allegedly due to the first shareholder were not specific and identifiable as belonging to *him*, but rather belonged to *the company's* general operating fund. *Id*. at 838. The conversion claim failed because it was direct, filed on behalf of the first shareholder, and not derivative, on behalf of the company. *Id*. at 824.

By contrast, Donald's conversion claim in Counterclaim VI is derivative, not direct. If Donald were seeking only direct relief for the injury inflicted on his 50% interest by Thomas's alleged overpayments, *Kovac* would require dismissal because Donald cannot allege that he had an "absolute and unconditional right to the immediate possession" of a share of those funds. *Id*. at 839. However, Donald's conversion claim is derivative, brought on behalf of Simplesoft, and because the funds in question would have come directly from Simplesoft's corporate treasury, Simplesoft *did* have an allegedly absolute and unconditional right to them. As a result, Donald has stated a claim for derivative conversion.

Counterclaim VII and Third-Party Claim III allege conspiracy to commit conversion against Thomas and Sheryl, respectively. The Steineses argue that because Donald failed to state a conversion claim in Counterclaim VI, the conspiracy claims fail as well. Doc. 108 at 11. Because the conversion claim survives, so do the conspiracy claims. The Steineses hint at another basis for dismissal: the doctrine that a conspiracy cannot exist between a principal and an agent. *Ibid*. However, they fail to develop this argument and thus have forfeited the point. *See Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

**III.    Third-Party Claim I**

Third-Party Claim I is Donald's individual (not derivative) fiduciary duty claim against Sheryl. Seeking dismissal, the Steineses contend that Sheryl did not owe Donald any fiduciary duty because she was only a director, not a co-owner, of Simplesoft. Doc. 108 at 12. Donald responds that under Illinois law, directors and officers owe fiduciary duties not only to the corporation, but to its shareholders. Doc. 118 at 14-15. Donald is incorrect.

Although corporate officers and directors "occupy a confidential or fiduciary relationship to the corporation and its shareholders," "the duties and obligations incident to this relationship are owed to the corporation and not to the shareholders individually." *Poliquin v. Sapp*, 390 N.E.2d 974, 978 (Ill. App. 1979). Moreover, "[i]t is well established that a shareholder of a corporation seeking relief for an injury to the corporation, rather than a direct injury to the shareholder himself, must bring the suit derivatively on behalf of the corporation." *Alpha School Bus Co., Inc. v. Wagner*, 910 N.E.2d 1134, 1157 (Ill. App. 2009); *see also Small v. Sussman*, 713 N.E.2d 1216, 1219 (Ill. App. 1999). So Third-Party Claim I, a direct claim on Donald's behalf, fails as a matter of law because the only legally cognizable injuries alleged in the claim are to Simplesoft's corporate interests.

**IV.    Duplicative Claims**

The Steines also move to dismiss Counterclaims X and XI, and Third-Party Claims IV and V, as duplicative of other counterclaims and third-party claims. Doc. 108 at 13. (The motion to dismiss Counterclaim X is couched in other terms, but in essence it seeks dismissal on the ground that it is duplicative.) Duplicative claims are subject to dismissal. *See Pumputiena v. Deutsche Lufthansa, A.G.*, 2017 WL 66823, *6 (N.D. Ill. Jan. 6, 2017). But dismissing a duplicative claim has no substantive impact—after all, a plaintiff can recover only once for any

particular injury, no matter how many claims or counts concerning that injury are alleged. Accordingly, rather than engage in this largely inconsequential matter at the pleading stage, the court will do so at summary judgment or before trial, when a more fully developed record will enable the court to more accurately ascertain whether the claims actually are duplicative.

## V.     Counterclaims IV and V, and Third-Party Claim II

Counterclaim IV alleges an individual claim for breach of fiduciary duty owed to Donald by Thomas. The Steineses move to partially dismiss that claim to the extent it alleges that Thomas caused Simplesoft to file an unauthorized suit against Donald. Doc. 108 at 13-14. Donald responds that the references to this lawsuit were not an attempt to bring a freestanding tort claim relating to the lawsuit, but rather were made "to supplement the facts supporting one of the elements of their overall breach of fiduciary duty claims." Doc. 118 at 2 n.1. A tort claim alleging that an underlying suit was baseless must be brought as an abuse of process or malicious prosecution claim. *See Pantone v. Demos*, 375 N.E.2d 480, 482 (Ill. App. 1978) (holding that Illinois courts should "reject any effort to extend the tort liability for the wrongful filing of a lawsuit beyond the ambit of an action for malicious prosecution or abuse of process"); *Lyddon v. Shaw*, 372 N.E.2d 685, 690 (Ill. App. 1978) (same); *Mouloki v. Epee*, 2016 WL 910496, *3 (N.D. Ill. Mar. 10, 2016) ("Illinois law … bars the [counterclaimants] from asserting a false light claim based on the contents of the Complaint because only malicious prosecution and abuse of process claims can be asserted against the act of filing a lawsuit."). Accordingly, ¶¶ 82e-f of Counterclaim IV, which pertain to Simplesoft's (now-dismissed) claims against Donald, are stricken.

Counterclaim V and Third-Party Claim II allege derivative claims for breach of fiduciary duty against Thomas and Sheryl, respectively. As with Counterclaim IV, the Steineses move to

partially dismiss those claims to the extent they allege that the Steineses caused Simplesoft to file an unauthorized suit against Donald. Doc. 108 at 13-14. The motion is denied, because an improper lawsuit *by* a corporation could harm that corporation by diverting funds from the corporate treasury for an inappropriate purpose. Such harm to the corporation may be redressed by a derivative claim.

## Conclusion

The Steineses' motion to dismiss is granted in part and denied in part. Third-Party Claim I is dismissed, and ¶¶ 82e-f of Counterclaim IV are stricken. The Steineses shall answer the surviving portions of the counterclaims and third-party claims by 6/6/2017.

May 23, 2017

United States District Judge